PATRICK ANGLESCY, appellant,

*v.*

DELIA COLGAN, respondent.

1. B. being the owner of two lots, numbered on the plot by which they were sold as lots 97 and 98, and in the belief that his dwelling-house stood entirely on No. 97, when, in fact, it lapped over two feet on lot 98, mortgaged lot 97 to K., both parties believing that the mortgage embraced the entire house and the ground on which it stood ; lot 98 was subsequently sold under a judgment against B.—*Held*, that the purchaser, being put upon inquiry by the circumstances, took such lot so sold subject to the equity of the mortgagee and his privies to have the incumbrance extended so as to cover an area co-extensive with the house.

2. The notice of a latent equity, putting the purchaser on inquiry, was inherent in the circumstance that it was not a rational inference that the mortgage was designed to embrace only a part of the house, leaving a fragment of two feet unaffected by it.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following opinion :

The complainant, Anglescy, asks for an injunction restraining the defendant, Colgan, from executing a judgment at law in ejectment against him. An order to show cause was awarded. Is Anglescy entitled to a preliminary injunction as the case now stands? Taking the statements of the bill, it appears that one Kelley was formerly the owner of four lots of land which were plotted and mapped on the map of Jersey City, and numbered 93, 97, 98 and 99. On June 1st, 1875, Kelley conveyed said lots to one Barrows, and Barrows secured a part of the consideration-money by his bond and a mortgage on lot 97, together with other property, for $3,000 ; that Kelley foreclosed this mortgage, and, at sale made by the sheriff, became the purchaser of said lot 97, and took a deed therefor ; and that Kelley went into the possession of said lot and occupied the house thereon, and on 25th April, 1879, sold and conveyed to Anglescy.

The bill states that Kelley represented that he was the owner of said house and land, and then states that all of the deeds refer to said lot by lot and "block" number, referring to the map, and that said lot 97 on said map referred to in said deeds is twenty-three feet four inches in width, but that the house upon said lot 97, which was erected for many years before Kelley sold it to Barrows, is about twenty-five feet in width, "and was located about two feet eight inches on the northerly side of lot ninety-eight."

It appears that the other three lots (93, 98 and 99) were, in 1876, conveyed by said Kelley to one Colgan and his wife, and that afterwards (1878) said Colgan conveyed his interest to his wife, who is the complainant, and that she brought her action at law in ejectment against Anglescy to recover that portion of lot 99, being about two feet and eight inches, which is covered by the house standing principally on lot 97, and which was standing there before the land was mapped and plotted into lots; and that in that action she recovered a judgment, and now threatens to execute.

The bill then states that the complainant, Anglescy, has other evidence which he was unable to produce at the trial of the action at law, further stating that said Kelley knew all about the arrangements, but it does not appear that Kelley was subpœnaed or that he could not be reached, and also that said Barrows was subpœnaed but failed to appear, and that his testimony is important.

Now, is there any equity in this? First, as to representations. What were they? When Kelley sold lot 97 to Anglescy he was in possession of the house which had for a long time stood partly on lot 99, which last lot was then owned by the defendant. Such possession of the house by Kelley may have been some advertisement to the world that he was the owner or had some rights or interests in all of the land which it covered. It was enough, perhaps, to put any one bargaining for lot 99 upon inquiry, but was the fact of possession of the house enough to justify Anglescy in dispensing with all further inquiry as to the title and quantity of land? Was it enough when the deed

which Anglescy accepted referred to the number of the lot and
to the map, which was a matter of record, and which correctly.
described the lot, giving its true width ? It would seem that
if the possession by Kelley was an advertisement of owner-
ship of any value in determining the equity of the parties, the
unequivocal advertisement or notice in the deed that there was a
map of the premises, a public record, should be at least of equal
account. Undoubtedly Anglescy was bound to heed that notice.
Kelley sold to him lot numbered 97 on a certain map, which
was as potent, to all intents, as though it had been copied in or
attached to the deed.

In the second place, it is said that Kelley represented that " he
was the owner of the house and lot." But the bill does not show
that Kelley represented that he was the owner of the two feet
and eight inches of lot 99 covered by the house. Indeed, the
bill does not show that that particular question was in any sense
alluded to by the parties. Nor does the bill state that the com-
plainant, Anglescy, believing such representations to be true,
relied upon them and made the purchase with the full conviction
that he was entitled to all the land covered by the house.

In the third place, it is too plain for discussion that no equities
arise from anything that was done or omitted at the circuit. It
does not appear that Kelley was subpœnaed. Barrows, who was
subpœnaed, did not attend ; but it does not appear that the court
refused to postpone the trial. I can see no fraud, nor any mistake
or surprise requiring the interference of this court.

I will advise an order setting aside the order to show cause,
and dissolving the *ad interim* restraining order. The costs will
abide the final determination of the suit.

*Mr. Peter Bentley,* for appellant.

*Mr. M. T. Newbold,* for respondent.

The opinion of the court was delivered by

BEASLEY, C. J.

This is an appeal from a refusal of the Vice-Chancellor to
order a preliminary injunction.

The posture of the facts is this : One Kelley, being the owner of two lots of land which were designated on the map of the plot to which they appertained as lots 97 and 98, and which were, respectively, described to be twenty-three feet four inches wide, sold them to James M. Barrows. At the time of this sale there was a dwelling-house on the property, which, it was then supposed, stood on lot 97, but which, in point of fact, was wider than that lot, encroaching a little over two feet on lot 98. Barrows, when he took his conveyance, made to his grantor, Kelley, in part payment of the purchase-money, a mortgage on lot 97, both he and the mortgagee believing that the house stood upon that lot exclusively.

It is proper to pause here to say that, at this juncture, the equities existing between these parties were indisputable. Both mortgagor and mortgagee supposed, at the time of creating the incumbrance, that it embraced the land occupied by the house, and it is shown, beyond cavil, that the intention of both these persons was to incumber this structure and the underlying premises. Indeed, the situation was such as, of itself, to repudiate every other conclusion, for it is an absurdity to suppose that it was the purpose to exempt from the lien so created one entire side and two feet of the front of the dwelling-house. And it is shown by express testimony, and which is entirely uncontradicted, that both mortgagor and mortgagee intended to lay the incumbrance on the entire house and on the lot of land of equivalent width. The design of both parties, therefore, having miscarried by reason of a mutual error, it is undeniable that the mortgagee had the right to require the correction of the error by a court of equity. Such relief was plainly his due *ex debito justitiæ*.

The only question, therefore—if there be any question—that remains open in the case, is, whether the right to have the mistake thus occurring corrected has been lost by the conduct of the mortgagee or of those claiming under him.

Barrows having given the mortgage above described, a judgment was afterwards obtained against him by virtue of which lot 98, being the lot encroached upon by the dwelling-house,

Anglesey *v.* Colgan.

was sold at sheriff's sale, and the title thence arising is now vested in Delia Colgan, the respondent.

The appellant holds his title through a foreclosure of the mortgage given by Barrows to Kelley.

The inquiry, therefore, is, whether the sale by the sheriff of lot 98 carried that property to the purchaser divested of the equitable right which, as we have seen, at that time was possessed by Kelley, the mortgagee. The solution of this question depends upon the extent and character of the knowledge or information with which such purchaser is to be charged. He knew of the existence of the mortgage, and he also knew that it was upon a lot on which there was a dwelling-house. Could he, therefore, as a reasonable person, infer that the mortgage was intended to cover merely a part of the land occupied by the house —that is, that those who had put the incumbrance there meant to incumber only a part of the building? Can it be plausibly said that such purchaser, when he made his bid, supposed that in buying lot 98 he was buying two feet of the front of the house in question? I consider it very plain that such an interpretation of such facts never has been, and never will be, put upon them by any person of sane mind. In such instances the house is the monument, visible to all men, designating in an almost unmistakable form the extent of the right, either legal or equitable, claimed by the mortgagee. Any other doctrine would be dangerous in the extreme. Very few persons, it is believed, in taking mortgages on premises apparently covered by a dwelling-house, verify by actual survey or measurement the extent of the lot, or its exact location, as described in the deed, and the consequence is that it is the general understanding that it is the obvious intent of both mortgagor and mortgagee that the incumbrance shall rest on an area of land commensurate with the dimensions of the building. Under such a condition of facts the suggestion never arises that the mortgage rests on only a portion of the building, leaving a fragment of it unincluded in the instrument. The situation in itself, and *proprio vigore*, calls for inquiry from all those who desire to take a title to any part of the land underlying the building. In this case, if inquiry

had been made, the equitable right sought to.be enforced by this bill would have been discovered.

This aspect of the case appears to have escaped the attention of the lower court. The Vice-Chancellor's theory was that it was incumbent on the mortgagee, or on the appellant claiming under him, to have discovered the mistake in question. His words are: "It would seem that, if the possession of Kelley (the mortgagee) was an advertisement of ownership, of any value in determining the equity of the parties, the unequivocal advertisement or notice in the deed that there was a map of the premises, a public record, should be of at least equal account." But this view quite ignores the pith of the question, for, granting that the map and the given number of the lot were indications of the extent of the mortgagee's title, nevertheless the existence of the dwelling-house of larger dimensions than the premises so described created the emergency putting all persons dealing in the matter on inquiry as to equities that might exist. And it is always this discrepancy between the record and the structure upon the land that presents the situation proclaiming the existence of a mistake or latent right.

In the present case, it is apparent that, during the entire period occupied by the devolutions of the titles to these respective tracts of land, all parties in interest remained in the false belief that this entire house stood on lot 97, and that it did not encroach on lot 98. This error was not discovered until the year 1883, when the respondent, making an actual measurement of her lots, ascertained the encroachment. Upon this discovery she brought an ejectment for the two feet in dispute, and this is the proceeding which the Vice-Chancellor refused temporarily to enjoin.

The mistake was one, in common, of these parties. It is expressly shown that when the respondent took her conveyance, she supposed that she was acquiring title to the land lying alongside of the appellant's house; she did not suppose that her right extended to any part of the premises covered by the building.

It is not perceived how, under these circumstances, the equitable right to relief that was vested originally in the mortgagee

Anglescy *v.* Colgan.

has been lost, and consequently the injunction prayed for should be granted.

The case of *McKelway* v. *Armour, 2 Stock. 115,* is of analogous nature to the present one, and, as it is conceived, was decided upon a correct principle. It does not appear to have been brought to the attention of the court below. The facts and the action taken by the Chancellor are thus stated in the *syllabus* of the reported case:

"Complainant erected a valuable dwelling-house, by mistake, on the land of the defendant; defendant lived in the vicinity, saw complainant progressing from day to day with the improvement, and admitted he did not suspect the erection to be on his lot until some time after its actual erection, when by actual measurement, to his surprise, he discovered the mistake. The court relieved the complainant, putting the defendant to as little inconvenience as possible."

It is obvious that the complainant in the reported case was not possessed of as strong a claim to equitable consideration as the present appellant has. In both cases the feature is presented of a controversy growing out of a mutual mistake, and in the case from the report it is expressly stated in the opinion, that although Armour stood by while the improvement was being made, he did not suspect that his lot was being occupied. The Chancellor also declares that McKelway was most at fault. His language is:

"It is very true, as was urged upon the argument, the complainant was most to blame in this matter. A diligent examination of the deed to Armour and an actual measurement of the land would have decided the difficulty. But it was a vacant lot of land, plotted out upon a map only, and the mistake was one which might occur to the most careful and most diligent man."

It will be observed that in this case relief was granted to the complainant, although it was adjudged that he was more in fault than his opponent.

In the case now in hand either of these parties, by having his lot located or measured, could have discovered the mistake in the placing of the house, and, in this particular, if negligence is to be imputed, they must share it equally. But, beyond this, according to a well-established rule of law, negligence must be at-

14

tributed to the respondent, as she made no investigation with respect to the rights of the appellant, although when she took her title the grantor of the appellant was in visible possession of the premises in dispute, holding under a mortgage which plainly indicated that it was designed to be an incumbrance, not upon a fragment of the building, but upon the whole of it. If the valuable and well-known doctrine that a person who is put on the alert by existing circumstances is to have imputed to him all the knowledge that a proper investigation would have disclosed to him, is ever to have force, it seems to me that it must be taken as the principle of decision in the present instance. A large train of cases on this subject are to be found in the notes to *Le Neve* v. *Le Neve, 2 Lead. Cas. in Eq. 109, 143 et seq.*, by a reference to which it will be at once perceived how much at variance the opposite view to that above propounded would be, not only with the current but with the totality of judicial opinion.

With respect to the objection that the remaindermen have not been made parties, it can have no weight on the present issue whether this interlocutory injunction should go against the owner of the life interest. If a perpetual injunction is sought for, it may be that the persons holding the ultimate right to the premises should be made defendants before the final hearing. The bill presents all the essential facts out of which the complainant's equity arises; and, as there is a general prayer for relief, according to well-established rules, no difficulty exists in point of pleading. The Vice-Chancellor so regarded it, and decided the case upon the merits.

It is not to be inferred, from anything that appears in the foregoing expression of opinion, that the view is entertained that, by force of the facts already proved, the appellant would be entitled to retain the strip of land in controversy without paying for it. In the present aspect of the case, if this were the final hearing, in my judgment, the appellant would be entitled to retain the land upon the equitable condition that he should be charged with its full value in the market. Probably he would also be charged with the costs of the ejectment. But this matter is not before the

court, and has been alluded to only to obviate a possible misconstruction of the views above expressed.

The decree, in my opinion, should be reversed, and an injunction should be issued as prayed for.

*Decree unanimously reversed.*